In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-15-00213-CR

ANGEL LEE BRYAN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 1st District Court
Jasper County, Texas
Trial Cause No. 12103JD

MEMORANDUM OPINION

A jury convicted appellant Angel Lee Bryan of murder and assessed punishment at twenty years of confinement. In her sole appellate issue, Bryan challenges the legal sufficiency of the evidence supporting her conviction. We affirm the trial court's judgment of conviction.

THE EVIDENCE

Bryan's husband, Doyle Bryan Jr., ("Doyle Jr.") testified that he and Bryan adopted the child victim, P.B., who was Bryan's niece's biological child. Doyle Jr.

1

testified that P.B. was premature and weighed approximately three pounds at birth. According to Doyle Jr., Bryan cared for P.B. during the weekdays while he was working and their other child was in school. Doyle Jr. explained that Bryan and P.B. shared a bedroom and P.B. had a separate playroom. On September 24, 2012, Bryan told Doyle Jr. that she had found P.B. on the floor and something was wrong with P.B. Doyle explained that P.B. was moving, but she was gasping for air.[1] Doyle Jr. took P.B. to the emergency room. P.B. died at Texas Children's Hospital on September 26, 2012. Bryan called Doyle Jr. from the sheriff's office on September 30, and during that call, Doyle Jr. told Bryan there was a broken baby bed in the home, as well as a hole in the wall, and that someone had located Bryan's drug stash in the home. Doyle Jr. denied ever seeing marks or bruises on P.B. and testified that P.B. was never abused.

Doyle Jr.'s daughter-in-law, Randall, testified that she had bought methamphetamine with Bryan on many occasions, and that she and Bryan had used drugs at Bryan's house many times. According to Randall, she and Bryan sometimes used drugs in the room where P.B. slept while P.B. was present. Randall testified that the methamphetamine made Bryan angry "a lot" and caused Bryan to suffer from insomnia. Randall explained that when Bryan was not using methamphetamine,

---

[1]Doyle Jr. also testified that Bryan told him that P.B. had fallen off a bed at Bryan's mother's home one or two months before that date.

2

she would sleep until late in the afternoon in the same room as P.B. After Bryan was arrested, Doyle Jr. asked Randall and her husband to search his home, and Randall testified that they found a needle, methamphetamine residue, and a crack in the wall by P.B.'s bed.

Dr. John Hall, an emergency physician at Christus Jasper Memorial Hospital, testified that he examined P.B. on September 24, 2012. According to Hall, P.B. was "not responding appropriately, essentially floppy and unresponsive[,]" and her oxygenation was low. Hall testified that Bryan told him P.B. appeared normal approximately twenty minutes before she was found. Hall explained that while P.B. was at Jasper Memorial Hospital, she began exhibiting symptoms of brain injury, and the initial CT scan showed some indications of swelling on one side of P.B.'s brain, so Hall determined that P.B. should be life-flighted to Texas Children's Hospital.

Dr. Marcella Donaruma of the child abuse pediatric section at Texas Children's Hospital testified that she examined nineteen-month-old P.B. on September 25, 2012. According to Donaruma, P.B. was very small for her age and had tested positive for drugs at birth. Donaruma testified that P.B. had been life-flighted to Texas Children's Hospital from Jasper Memorial Hospital. Donaruma explained that, as part of P.B.'s treatment, x-rays and CT scans were performed,

3

and it was her opinion that P.B. died from a closed-head injury that cracked her skull into two pieces. According to Donaruma, such an injury could have been caused by "[a] rapid forceful blow to the thickest bone in the skull that resulted in failure of the bone as it tried to protect the brain." Donaruma opined that P.B.'s injuries were caused by child abuse, and she explained that the injuries were inflicted by someone "with the size and strength of an adult." Donaruma testified that in P.B.'s room, there were "a variety of flat surfaces and hard edges that could have hit her head or her head could have hit."

Donaruma explained that the brain damage P.B. suffered could have happened simultaneously with the skull fracture or on another day, but "it was the brain damage that killed her." According to Donaruma, P.B. could have suffered head trauma on more than one occasion, but "an ultimate head tra[u]ma event killed her." Donaruma testified that she was not surprised that the autopsy report said P.B.'s injuries were not externally visible because fractures inside the body do not necessarily produce visible bruises.

Dr. Morna Gonsoulin, the Assistant Medical Examiner at the Harris County Institute of Forensic Science, testified that she performed an autopsy on P.B. and prepared a written report of her findings. Gonsoulin explained that there was no external evidence of the injuries to P.B.'s head, but the internal examination of

4

P.B.'s body revealed a fracture of the occipital bone that was more than a few days old, as well as a large collection of blood in the left hemisphere of P.B.'s brain and a hemorrhagic clot between the membrane and the dura. Gonsoulin testified that it required a significant amount of force to generate such a fracture, and she characterized it as "a major blow." Gonsoulin explained that a blow that could cause such a fracture would have rendered P.B. unconscious. Gonsoulin described the clot as a multi-layered hematoma, and she explained that P.B. survived an initial skull fracture, but subsequently suffered a new injury that aggravated the old injury and caused massive bleeding.

According to Gonsoulin, when she examined P.B.'s spinal cord and eyes, she found evidence of a hemorrhage in the spinal cord and nerve sheath hemorrhage in both of P.B.'s eyes. Gonsoulin explained that shaking a child violently could injure her brain, as could striking her head with or against a solid object. Gonsoulin testified that she collected some of P.B.'s hair during the autopsy and took blood samples. Gonsoulin determined that the cause of P.B.'s death was "acute on chronic subdural hemorrhage with resolving skull fracture due to blunt force head injuries[,]" and a contributory cause of her death was failure to thrive. Gonsoulin concluded that the manner of P.B.'s death was homicide.

5

Sharon Derrick, a forensic anthropologist with Harris County Institute of Forensic Sciences, testified that after the autopsy, she performed a skeletal examination and trauma analysis of P.B. and prepared a written report. Derrick explained that she observed a healing fracture of one of P.B.'s ribs, and she estimated that the fracture was two to three weeks old. Derrick also testified that the left occipital bone of P.B.'s skull was fractured, and her posterior cranium was fractured in two places. In her report, Derrick stated that the skull injuries were consistent with an impact to the head against an object of relatively large surface area, and she opined that all of the skull fractures appeared to be related and appeared to be approximately two to three weeks old.

Ranger Daniel A. Young, a Texas Ranger with the Texas Department of Public Safety, testified that Bob Walker[2] of the Jasper County Sheriff's Office contacted him regarding P.B. and requested his assistance with the investigation. Young contacted Ranger Scotty Shiver about speaking to P.B.'s parents and the doctors at Texas Children's Hospital, and after Shiver did so, Young and Walker drafted a probable cause affidavit, obtained a warrant to search the Bryans' home, and searched the home. Young explained that the information he initially received from Bryan and Doyle Jr. indicated that P.B. was injured in her play room, so the

[2]Walker also testified regarding the search of the Bryan home and the investigation of the case.

search initially focused on that area. Bryan had stated that her other child found P.B. unresponsive in the play room. After searching the home and reviewing a physician's statement regarding the injury to P.B., Young and Walker traveled to Texas Children's Hospital and met with Donaruma and Ranger Shiver. Donaruma informed Walker that P.B.'s injuries were consistent with child abuse. Shiver told Young and Walker that he had interviewed Bryan and Doyle Jr. earlier that day. Bryan agreed to a second interview the following day, which was digitally recorded. On September 27, 2012, Texas Children's Hospital notified Young that P.B. had died, and Bryan was arrested the same day.

On October 1, 2012, Young and Walker searched the Bryan home a second time after Doyle Jr. contacted them regarding something that had been discovered in the home. Young and Walker photographed cracks in the paneling behind P.B.'s bed and numerous cracks in the headboard of the baby bed. Young photographed "two hair fragments that appeared to be connected by a hair root that were stuck in the paneling . . . in the crack that was by the light socket." Walker swabbed the crack in the wall and collected the hair as evidence, and Young later sent the hair and the swab to the DPS lab in Houston. Upon reviewing the photographs taken during the initial search, Young and Walker saw the same crack in the wall that they photographed during the second search. On October 1, 2012, Walker

7

conducted an interview of Bryan that was recorded on video. During that interview, Bryan stated that she had lied about her other child finding P.B. unresponsive, and she stated that she had tripped over one of her dogs and had accidentally fallen with P.B. in the hallway.

Jenny Lounsberry, a forensic scientist with DPS, testified that the hairs recovered from P.B.'s head during the autopsy were sent to DPS for analysis, and the Texas Rangers also sent DPS hair fragments recovered from the wall of Bryan's residence. DPS also received a specimen of P.B.'s blood. Lounsberry compared the hair from the wall in the Bryan's home with the hair obtained during the autopsy and concluded that the "two hair fragments recovered from the crack in the wall were found similar [to] the characteristics from [P.B.] taken at autopsy or any other person with similar hair characteristics." Lounsberry explained that she could not provide a percentage of certainty because DNA could not be extracted, and only DNA can provide information about how many people in the population have certain hair characteristics.

Bryan's mother, Jeri Carolyn Bohler, testified that she lived next door to the Bryans for much of P.B.'s life and visited with them every day, and she never noticed P.B. being mistreated. According to Bohler, Doyle Jr.'s son and Randall sometimes babysat P.B., as did one of Randall's daughters. Bohler testified that

8

she also babysat P.B. and during the last four months of P.B.'s life, P.B. fell off the bed and hit her head on the floor while Bohler was keeping her. Bohler described another occasion when P.B. fell on the patio and bumped her head. Bohler testified that the crack in the wall above P.B.'s bed occurred when Bryan tossed a jar of diaper rash cream and the jar cracked the wall. According to Bohler, Bryan does not use drugs.

BRYAN'S ISSUE

In her sole appellate issue, Bryan challenges the legal sufficiency of the evidence. Specifically, Bryan argues that the evidence was legally insufficient to prove that she knowingly and intentionally committed an act clearly dangerous to human life by striking P.B.'s head with or against an instrument and violently shaking P.B., thereby causing P.B.'s death.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact finder is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We

9

give full deference to the fact finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the fact finder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Id*. (quoting *Hooper*, 214 S.W.3d at 13). Appellate review of evidentiary sufficiency in circumstantial evidence cases no longer requires that the evidence exclude every reasonable hypothesis other than the defendant's guilt. *Geesa v. State*, 820 S.W.2d 154, 160-161 (Tex. Crim. App. 1991), *overruled on other grounds*, *Paulson v. State*, 28 S.W.3d 570, 572 (Tex. Crim. App. 2000).

As previously discussed, the jury is the sole judge of the witnesses' credibility and the weight of their testimony. *Jackson*, 443 U.S. at 318-19; *see also Hooper*, 214 S.W.3d at 13. Viewing the evidence in the light most favorable to the State, the jury could reasonably conclude, beyond a reasonable doubt, that Bryan committed the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(3) (West 2011); *Jackson*, 443 U.S. at 318-19; *Hooper*, 214 S.W.3d at 13; *see also Brooks*, 323 S.W.3d at 899; *Geesa*, 820 S.W.2d at 160-161; *Clayton*, 235 S.W.3d at 778. Accordingly, we overrule Bryan's sole issue and affirm the trial court's judgment of conviction.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on October 18, 2016
Opinion Delivered November 16, 2016
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.